# EXHIBIT A

 ®Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
01/10/2023
CT Log Number 542996667

## Service of Process Transmittal Summary

**TO:**     Alan Nadel, Attorney
           Syngenta Crop Protection, LLC
           410 S Swing Rd
           Greensboro, NC 27409-2012

**RE:**     **Process Served in Illinois**

**FOR:**    Syngenta Crop Protection, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: Deborah K. Gorman as trustee for the Thomas E. Grandcolas Revocable Trust dated September 21, 2000, as amended, as representative of the estate of Thomas E. Grandcolas, deceased and Nancy C. Grandcolas, individually and as the surviving spouse of Thomas E. Grandcolas // To: Syngenta Crop Protection, LLC |
| **CASE #:** | 22LA1055 |
| **NATURE OF ACTION:** | Product Liability Litigation - Personal Injury |
| **PROCESS SERVED ON:** | C T Corporation System, Chicago, IL |
| **DATE/METHOD OF SERVICE:** | By Process Server on 01/10/2023 at 16:05 |
| **JURISDICTION SERVED:** | Illinois |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780111498955 |
| | Image SOP |
| | Email Notification,  CHRISTINA LENTZ  chris.lentz@syngenta.com |
| | Email Notification,  Carolyn Guelich  carolyn.guelich@syngenta.com |
| | Email Notification,  Alan Nadel  ALAN.NADEL@SYNGENTA.COM |
| | Email Notification,  Cheryl L Quain  cheryl.quain@syngenta.com |
| | Email Notification,  Mark Smith  mark.smith-1@syngenta.com |
| | Email Notification,  Manning Connors  manning.connors@syngenta.com |
| | Email Notification,  John Burleigh  john.burleigh@syngenta.com |
| | Email Notification,  Lance Arnott  sopverification@wolterskluwer.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 208 South LaSalle Street |
| | Suite 814 |
| | Chicago, IL 60604 |
| | 866-401-8252 |
| | EastTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT



disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                                       Tue, Jan 10, 2023
**Server Name:**                         Christopher Rodriquez

| Entity Served | SYNGENTA CROP PROTECTION, LLC |
|---|---|
| Case Number | 22-LA-1055 |
| Jurisdiction | IL |

| Inserts | | |
|---|---|---|
| | | |



## IN THE CIRCUIT COURT OF
## ST. CLAIR COUNTY, STATE OF ILLINOIS

| | |
|---|---|
| DEBORAH K. GORMAN, et al.,      ) | |
|                          ) | |
| **Plaintiffs,**          ) | |
|                          ) | |
| v.                               ) | Case No.  22-LA-1055 |
|                          ) | |
| SYNGENTA CROP PROTECTION, LLC, a  ) | |
| foreign corporation, SYNGENTA AG, a foreign  ) | |
| corporation, and ST. CLAIR SERVICE      ) | |
| COMPANY, an Illinois corporation,       ) | |
|                          ) | |
| **Defendant.**        ) | |

## SUMMONS

To Defendant:         SYNGENTA CROP PROTECTION, LLC
Registered Agent:
CT CORPORATION SYSTEM
208 SOUTH LASALLE STREET, SUITE 814
CHICAGO, IL 60604

You are summoned and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, in the office of the clerk of this court within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

E-filing is now mandatory for documents in civil cases with limited exemptions. To efile, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/ to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

To the officer: This summons must be returned by the officer or other person to whom it was given for service, with indorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so indorsed. This summons may not be served later than 30 days after its date.

Witness _____1/4/2023_____
               CARMEN GLENN

(Seal of Court)

_____                          _____
Clerk of Court

Plaintiff's Attorney:
Christopher Cueto, IL 06192248
Law Office of Christopher Cueto, Ltd.
7110 West Main Street
Belleville, IL 62281
Phone:  (618) 277-1554
Facsimile:  (618) 277-0962
Email:  ccueto@cuetolaw.com


Date of service _____, 20_____
(to be inserted by officer on copy left with defendant or other person).

Electronically Filed
Kinnis Williams, Sr.
Circuit Clerk
CARMEN GLENN
22LA1055
St. Clair County
12/12/2022 10:46 AM
20631984

## IN THE CIRCUIT COURT OF
## ST. CLAIR COUNTY
## STATE OF ILLINOIS

| | |
|---|---|
| **DEBORAH K. GORMAN as trustee for the Thomas E. Grandcolas Revocable Trust dated September 21, 2000, as amended, as representative of the estate of THOMAS E. GRANDCOLAS, deceased,** | ) ) ) ) ) ) |
| **and** | ) ) |
| **NANCY C. GRANDCOLAS, individually and as the surviving spouse of THOMAS E. GRANDCOLAS,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) ) |
| **SYNGENTA CROP PROTECTION LLC, a foreign corporation, SYNGENTA AG, a foreign corporation, and ST. CLAIR SERVICE COMPANY, an Illinois corporation,** | ) ) ) ) ) |
| **Defendants.** | ) ) ) |

Case No.: 22-L-A1055_____

**JURY TRIAL DEMANDED**

## COMPLAINT

COME NOW Plaintiffs DEBORAH K. GORMAN, on behalf of the Estate of THOMAS E. GRANDCOLAS, deceased, and NANCY C. GRANDCOLAS (individually and as surviving spouse of Thomas E. Grandcolas, deceased (collectively, where appropriate, "Mr. and Mrs. Grandcolas"), by and through undersigned counsel, bring this action for damages against Defendants SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, and ST. CLAIR SERVICE COMPANY. Defendants designed, formulated, manufactured, sold, distributed and/or applied the herbicide Paraquat. Both Mr. and Mrs. Grandcolas developed Parkinson's

disease as a result of their frequent, regular, direct, and indirect exposures to Paraquat. Mr. Grandcolas died from Parkinson's disease on January 5, 2021. Mrs. Grandcolas suffers from advanced Parkinson's disease and resides in an institution that provides her with her inpatient medical and nursing care made necessary by her injuries related to Paraquat exposures. In support, Mr. and Mrs. Grandcolas allege as follows:

## I.      **INTRODUCTION**

### A.      **Nature of the case**

1.      Paraquat is a synthetic chemical compound that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("Paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the State of Illinois.

2.      Defendant Syngenta Crop Protection LLC and Defendant Syngenta AG are companies and successors-in-interest to companies that manufactured, distributed, and sold Paraquat for use in Illinois, acted in concert with others who manufactured, distributed, and sold Paraquat for use in Illinois, sold and used Paraquat in Illinois, or owned property in Illinois where Paraquat was used.

3.      Defendant St. Clair Services Company used, sold, distributed, applied, or otherwise acted in concert with others who used or applied, Paraquat to property in Illinois adjacent, or sufficiently close, to property owned by Mr. and Mrs. Grandcolas.

4.      Mr. and Mrs. Grandcolas were exposed to Defendants' Paraquat products because they owned property and/or resided on property adjacent, or sufficiently close, to property where Defendants' Paraquat products were used regularly and frequently over a period of many years.

2

5.      Plaintiffs bring this action against Defendants to recover damages for personal injuries and other economic damages resulting from Mr. and Mrs. Grandcolas's frequent, regular, direct, and indirect exposures to Paraquat over many years.

## II.     PARTIES

### A.      Plaintiffs

6.      Decedent Thomas E. Grandcolas ("Mr. Grandcolas") was a citizen and resident of the State of Illinois who suffered neurological injuries consistent with Parkinson's disease ("PD") caused by regular, frequent, and prolonged exposure to Paraquat[1] from Defendants' Paraquat products in the State of Illinois.  He developed Parkinson's disease as a result of his frequent, regular, direct and indirect exposures to Paraquat, and died as a result of Parkinson's disease caused by these Paraquat exposures on January 5, 2021.

7.      Deborah K. Gorman is the duly appointed and acting trustee of the Thomas E. Grandcolas Revocable Trust dated September 4, 2000, as amended, and as such is authorized to bring this action for the benefit of Decedent pursuant to the Illinois Wrongful Death Act 740 ILCS 180/2, *et seq.*

8.      Plaintiff Nancy C. Grandcolas ("Mrs. Grandcolas") is a citizen and resident of the State of Illinois who has suffered, and continues to suffer, from neurological injuries consistent with Parkinson's disease ("PD") caused by regular, frequent, and prolonged exposure to Paraquat[2] from Defendants' Paraquat products in the State of Illinois.

---

[1]  Unless the context indicates otherwise, references in this Complaint to "Paraquat" include the chemical compound paraquat dichloride and formulated herbicide products containing paraquat dichloride as an active ingredient.

[2]  Unless the context indicates otherwise, references in this complaint to "Paraquat" include the chemical compound paraquat dichloride and formulated herbicide products containing paraquat dichloride as an active ingredient.

3

9.     Mrs. Grandcolas has suffered losses of the services and consortium of Mr. Grandcolas as a result of the illness and untimely death of Mr. Grandcolas. Mrs. Grandcolas was and had been the lawful spouse of Mr. Grandcolas from May 27, 1967 until the time of his death on or about January 5, 2021.

**B.     Defendants**

10.     Defendant Syngenta Crop Protection LLC ("SCPLLC") is a Delaware company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly owned subsidiary of Defendant Syngenta AG.

11.     Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Basel, Switzerland.

12.     Defendant St. Clair Service Company ("Services Company") is an Agricultural Cooperative organized under the Illinois Agricultural Co-operative Act and incorporated in the State of Illinois.

## III.     JURISDICTION AND VENUE

13.     This Court has personal jurisdiction pursuant to 735 ILCS 5/2-209(a). Defendants Services Company, Syngenta AG, and Syngenta Crop Protection LLC have transacted and continue to transact business within the state of Illinois and have committed numerous tortious acts as set forth herein. Furthermore, Defendants Syngenta AG and Syngenta Crop Protection LLC business operations within the State of Illinois, including the sale of Paraquat and other products, constitutes sufficient minimum contacts within Illinois such that maintenance of a suit in Illinois does not offend traditional notions of fair play and substantial justice. Mr. and Mrs. Grandcolas are, or were at all times mentioned herein, citizens of Illinois.

14.     This Court has subject matter jurisdiction as it is a court of general jurisdiction,

4

Mr. and Mrs. Grandcolas's claims include tort claims proper for disposition before a court of general jurisdiction, and Defendant Services Company may be found in St. Clair County, Illinois.

15.      Venue is proper in St. Clair County, State of Illinois, pursuant to 735 ILCS 5/2-101 because Defendants conduct business in that County, are subject to jurisdiction in that County, a substantial part of the acts or occurrences giving rise to this suit occurred there, and Defendants have sold, marketed, used, applied, and/or distributed Paraquat within St. Clair County and the State of Illinois at all times relevant to this suit. Furthermore, Defendant Services Company and Mr. and Mrs. Grandcolas were and/or are domiciled in the state of Illinois.

16.      There is no federal diversity jurisdiction under the plain language of 28 U.S.C. § 1332 because Mr. and Mrs. Grandcolas suffered their injuries in the State of Illinois and were citizens and residents of the State of Illinois at the time of all relevant acts and omissions. Defendant St. Clair Service Company is and has been an Illinois corporation, with its residency and its principal place of business in the State of Illinois at all times relevant to Mr. and Mrs. Grandcolas's Complaint.  Therefore, complete diversity does not exist as between Mr. and Mrs. Grandcolas and Defendants, and no federal subject matter jurisdiction exists.  This matter is properly filed in this Court.

## IV.    **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

### A.     **Syngenta Crop Protection LLC and Syngenta AG**

17.      In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").

5

18.     On or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively, "ICI Americas").

19.     In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

20      In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

21.     As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

22.     Before ICI's demerger and creation of the Zeneca Group, ICI had a Central Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

23.     As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

24.    After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

25.    As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

26.    In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

27.    As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

28.    In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

29.    In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG ("SAG") as the ultimate parent company.

30.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

31.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

32.     Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of Paraquat and other pesticides for use in the United States.

33.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

34.     In 2010, SCPI was converted into Defendant Syngenta Crop Protection LLC ("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, North Carolina.

35.     SAG is a successor by merger or continuation of business to its corporate predecessor Novartis AG.

36.     SAG is a successor by merger or continuation of business to its corporate predecessor AstraZeneca PLC.

8

Case 3:23-pq-00369-NJR   Document 1-1   Filed 02/03/23   Page 15 of 66   Page ID #25


37.     SAG is a successor by merger or continuation of business to its corporate predecessor Zeneca Group PLC.

38.     SAG is a successor by merger or continuation of business to its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

39.     SAG is a successor by merger or continuation of business to its corporate predecessor ICI Bioscience Ltd.

40.     SAG is a successor by merger or continuation of business to its corporate predecessor Plant Protection Ltd.

41.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor SCPI.

42.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor NCPI.

43.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor Ciba-Geigy Corporation.

44.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor Zeneca Inc.

45.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc.

46.     SCPLLC is registered to do business in the state of Plaintiff's residence and/or exposure.

47.     SCPLLC does substantial business in the state of Plaintiff's residence and/or exposure, including the following:

a.      markets, advertises, distributes, sells, and delivers Paraquat and other pesticides to distributors, dealers, applicators, and farmers in the state of Plaintiff's residence and/or exposure;

b.      secures and maintains the registration of Paraquat and other pesticides with the EPA to enable itself and others to manufacture, distribute, sell, and use these products in the state of Plaintiff's residence and/or exposure; and

c.      performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the state of Plaintiff's residence and/or exposure.

48.     SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

49.     SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.

50.     SAG is a management holding company.

51.     Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

52.     SCPAG employs the global operational managers of production, distribution and marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.

53.     The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.

54.     The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

55.     SCP AG directly and wholly owns Syngenta International AG ("SIAG").

56.     SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

10

57.     SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

58.     SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

59.     Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

60.     SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

a.      SAG directly and wholly owns Syngenta Participations AG;

b.      Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

c.      Seeds JV C.V. directly and wholly owns Syngenta Corporation;

d.      Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC;

e.      Syngenta Seeds, LLC directly and wholly owns SCPLLC.

61.     Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

62.     SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

63.     SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

64.     Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management" system of functional

11

reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

65.     The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

66.     SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

67.     SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.

68.     The SEC consists of the CEO and various global Heads, which currently are:

      a.     The Chief Executive Officer;

      b.     Group General Counsel;

      c.     The President of Global Crop Protection;

      d.     The Chief Financial Officer;

      e.     The President of Global Seeds; and

      f.     The Head of Human Resources;

69.     SIAG employs all of the members of the Executive Committee.

70.     Global Syngenta Group corporate policies require SAG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

71.     SAG's board of directors meets five to six times a year.

72.     By contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

73.     Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

74.     Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

75.     Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

76.     Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

77.     The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

78.     Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.

79.     The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

80.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Group's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

81.     The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

82.     The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports to the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

83.     Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

84.     Syngenta Group global Heads that supervise SCPLLC employees participate and have in the past participated in the performance reviews of these employees and in setting their compensation.

85.     The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of

affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

86.    SCPLLC performs its functions according to its role in the CP Division structure:

a.    CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

b.    New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

c.    These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d.    Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e.    Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f.    If a product shows promise based on this testing and the potential markets for the product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g.    decisions to sell the product must be approved by the SEC;

h.    The products that are sold all bear the same Syngenta trademark and logo.

87.    SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

88.    These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

15

89.     For example, although SAG permits Syngenta Croup companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

90.     Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner.

91.     Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

92.     Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

93.     SAG and the global management of the Syngenta Group restrict the authority of SCPLLC to act independently in areas including:

a.      Product development;

b.      Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of Paraquat and other herbicides);

c.      Production;

d.      Marketing;

e.      Sales;

f.      Human resources;

g.      Communications and public affairs;

h.      Corporate structure and ownership

i.      Asset sales and acquisitions

j.      Key appointments to boards, committees and management positions;

k.      Compensation packages;

l.      Training for high-level positions; and

m.      Finance (including day-to-day cash management) and tax.

94.      Under the Syngenta Group's functional management system, global managers initiate and the global Head of Human Resources oversees international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make employees fit for higher positions within the global Syngenta Group of companies.

95.      Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

96.      The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

97.      The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

17

98.     Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

99.     The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

100.     Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

101.     SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

102.     In 2011, the United States District Court for the Southern District of Illinois held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to jurisdiction in the State of Illinois. *See City of Greenville, Ill. v. Syngenta Crop Protection, Inc.*, 830 F. Supp. 2d 550 (S.D. Ill. 2011).

103.     SAG continues to exercise the unusually high degree of control over SCPLLC that led the District Court to find in 2011 that SAG was subject to jurisdiction in the State of Illinois.

**B.     St. Clair Farm Services**

104.     Defendant Farm Services has been serving St. Clair County farmers and residents since approximately 1931.

105.     One of the many services that Defendant Farm Services offers to the farmers and residents of St. Clair County is the supply and application of a full line of herbicides, pesticides, and insecticides, including Paraquat, as part of its weed and pest management services.

18

106. Defendant Farm Services and/or its employees or agents sprayed, applied, or otherwise utilized Paraquat at or near the property immediately abutting the property of Plaintiffs to the South and bearing the address of 8055 Jefferson Road, Freeburg, Illinois 62243 between the years 1997 and 2018 as part of its weed and pest management services.

## C.   Paraquat Manufacture, Distribution, and Sale

107. ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of Paraquat in 1955.

108. The leading manufacturer of Paraquat is Syngenta, which (as ICI) developed the active ingredient in Paraquat in the early 1960s.

109. ICI produced the first commercial Paraquat formulation and registered it in England in 1962.

110. Paraquat was marketed in 1962 under the brand name Gramoxone.

111. Paraquat first became commercially available for use in the United States in 1964.

112. In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of Paraquat ("the ICI-Chevron Chemical Agreements").

113. In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.

114. The ICI-Chevron Chemical Agreements were renewed or otherwise remained in effect until about 1986.

115. In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have formulated, use, and sell Paraquat in the United States and to grant sub-licenses to others to do so.

19

116.    In the ICI-Chevron Chemical Agreements, Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell Paraquat throughout the world and to grant sub-licenses to others to do so.

117.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding Paraquat.

118.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell Paraquat in the United States.

119.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to distribute and sell Paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

120.    ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for Paraquat between them.

121.    Under the ICI-Chevron Chemical Agreements, Chevron Chemical distributed and sold Paraquat in the U.S. and ICI and ICI Americas distributed and sold Paraquat outside the United States.

122.    Under the ICI-Chevron Chemical Agreements and related agreements, both ICI and ICI Americas and Chevron Chemical distributed and sold Paraquat under the ICI-trademarked brand name Gramoxone.

123.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding Paraquat.

124.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central

20

Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States.

125.    Under the ICI-Chevron Chemical Agreements and related agreements, ICI and ICI Americas manufactured and sold Paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in Illinois, where Chevron Chemical registered Paraquat products with the Illinois Departments of Agriculture and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

126.    Under the ICI-Chevron Chemical Agreements and related agreements, Chevron Chemical distributed and sold Paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in Illinois, where Chevron Chemical registered such products with the Illinois Departments of Agriculture to enable them to be lawfully distributed, sold, and used in Illinois, and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

127.    SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their Paraquat products to be distributed and sold in Illinois, where they registered such products with the Illinois Departments of Agriculture to enable them to be lawfully distributed, sold, and used in Illinois, and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

128.    SAG and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the

21

registration of Paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

129.   SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their Paraquat products to be distributed and sold in Illinois, where they registered such products with the Illinois Departments of Agriculture to enable them to be lawfully distributed, sold, and used in Illinois, and marketed, advertised, and promoted them to Illinois distributors, dealers, applicators, and farmers.

130.   SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of Paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

131.   Chevron Chemical manufactured, formulated, distributed, and sold Paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in the State of Illinois, where Chevron Chemical registered such products with the State of Illinois to enable them to be lawfully distributed, sold, marketed, advertised, and promoted to distributors, dealers, applicators, and farmers.

**D.    Paraquat Use**

132.   Since 1964, Paraquat has been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest.

22

133.   At all relevant times, where Paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable.

134.   At all relevant times, Paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

135.   At all relevant times, concentrates containing Paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

### E.   Paraquat drift exposures

136.   At all relevant times, Paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

23

137.    The Environmental Protection Agency defines pesticide drift[3] (also known as agricultural drift) as occurring when pesticide or herbicide move "through the air at the time of application or soon after, to any site other than the area intended."

138.    Pesticide drift has been called an "insidious threat to human health." A report in Scientific American stated that "the biggest risk from pesticide drift is to those living, working, or attending school near larger farms which employ elevated spraying equipment or crop duster planes to apply chemicals to crops and fields."

139.    Paraquat drift can occur when the toxic weed killer (herbicide) is carried through the air during and after application to unintended areas, potentially endangering nearby property owners and residents.

140.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who were in or near areas where Paraquat was being or recently had been sprayed would be exposed to Paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

141.    At all relevant times, it was reasonably foreseeable that when Paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to Paraquat, including as a result of spills, splashes, and leaks, or seepage into the water supply while equipment used to spray Paraquat was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared.

---

[3] A pesticide is any substance used to kill, repel, or control certain forms of plant or animal life that are considered to be pests. Pesticides include herbicides, such as Paraquat, applied to destroy weeds and other unwanted vegetation.

24

142.    At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via ingestion, inhalation, absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, digestive tract, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

143.    At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

144.    At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body via ingestion into the digestive tract through the mouth by ingestion of spray and/or ingestion from contaminated water supply, or swallowed after entering the mouth, nose, or conducting airways.

145.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

146.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

147.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

148.    At all relevant times, it was reasonably foreseeable that Paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

25

**F.     Mr. and Mrs. Grandcolas had frequent and regular exposures to Paraquat.**

149.     At all relevant times, Mr. and Mrs. Grandcolas had frequent, regular and significant were exposed to Paraquat from approximately 1997 to 2018: (1) as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); (2)  by contamination with Paraquat of the water supply of the home in which Mr. and Mrs. Grandcolas resided from 1997 to 2018 due to runoff; and (3) as a result of contact with sprayed plants (transdermal exposures).

150.     At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to it.

151.     At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; (4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways; and (5) through drinking and ingestion of water from wells and/or groundwater that had been contaminated by Paraquat from runoff.

152.     From 1997 to 2018, Mr. and Mrs. Grandcolas had frequent and regular and significant exposures to Paraquat through inhalation, ingestion, and absorption of Paraquat that Defendant Farm Services and others applied and sprayed on farms or other real property that were adjacent, or sufficiently close, to the Grandcolas residence in St. Clair County, Illinois.

26

153.    As a result of their frequent, regular, repeated and consistent Paraquat exposures, Mr. and Mrs. Grandcolas began suffering neurological injuries consistent with Parkinson's disease in 2002 and 2004, respectively, and both were diagnosed with Parkinson's disease.

154.    Defendants knew or should have known of the risk of neurological injuries to persons who used Paraquat, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed and fraudulently concealed said risk.

155.    No doctor or any other person told Mr. and Mrs. Grandcolas that their injuries were or could have been caused by exposure to Paraquat.

156.    Mr. and Mrs. Grandcolas had never read nor were Mr. and Mrs. Grandcolas aware of any articles in newspapers, scientific journals, or other publications that associated Parkinson's disease with Paraquat.

157.    Mr. and Mrs. Grandcolas had never read nor were Mr. and Mrs. Grandcolas aware of any lawsuit alleging that Paraquat causes Parkinson's disease.

158.    At no time during Mr. and Mrs. Grandcolas's exposures to Paraquat were either aware that exposures to Paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to Paraquat.

159.    On information and belief, both Mr. and Mrs. Grandcolas were exposed to Paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of Mr. and Mrs. Grandcolas's exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

27

160.    On information and belief, Mr. and Mrs. Grandcolas were exposed to Paraquat that was sold and used in Illinois, and was manufactured, distributed, and on information and belief sold by one or more Defendants, their corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in the state of Illinois.

161.    On information and belief, Mr. and Mrs. Grandcolas were exposed to Paraquat that was sold and used in the state of Illinois, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in the state of Illinois.

162.    On information and belief, Mr. and Mrs. Grandcolas were exposed to Paraquat that was sold and used in the state of Illinois, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in the state of Illinois.

163.    From approximately 1997 until 2018, Mr. and Mrs. Grandcolas were repeatedly exposed to, inhaled, ingested, and/or absorbed Paraquat through their skin in the States of Illinois due to the application and spraying of Paraquat performed on the neighboring property by Defendant Services Company.

164.    Each exposure of Mr. and Mrs. Grandcolas to Defendants' Paraquat products caused or contributed to cause Mr. and Mrs. Grandcolas to develop Parkinson's disease by initiating a decades-long process in which oxidation and oxidative stress, created or aggravated by the ongoing redox cycling of Paraquat, damaged and interfered with essential functions of dopaminergic neurons in his SNpc, resulting in the ongoing degeneration and death, as time passed, of progressively more dopaminergic neuron.

28

165.    When Mr. and Mrs. Grandcolas were exposed to Paraquat, neither knew nor could have expected that taking any precautions, such as personal protective equipment might have prevented or reduced the risk of a neurological injury or neurodegenerative disease caused by exposure to Paraquat.

166.    On information and belief, Mr. and Mrs. Grandcolas were exposed to Paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of Mr. and Mrs. Grandcolas's exposures as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

167.    On information and belief, Mr. and Mrs. Grandcolas were exposed to Paraquat that was sold and used in Illinois, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Illinois.

168.    On information and belief, Mr. and Mrs. Grandcolas were exposed to Paraquat that was sold and used in Illinois, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Illinois.

169.    On information and belief, Mr. and Mrs. Grandcolas were exposed to Paraquat sprayed, applied, or otherwise used by Defendant Services Company at or near the address of 8055 Jefferson Road, Freeburg, Illinois 62243 between the years 1997 and 2018.

G.    **Parkinson's Disease**

170.   Parkinson's disease is progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

171.   Scientists who study PD generally agree that fewer than 10% of all Parkinson's disease cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

1.   **Symptoms and treatment**

172.   The characteristic symptoms of PD are its "primary" motor symptoms:  resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

173.   PD's primary motor symptoms often result in "secondary'' motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

174.   Non-motor symptoms - such as loss of or altered sense of smell, constipation, low blood pressure on rising to stand, sleep disturbances, and depression - are present in most cases of PD, often for years before any of the primary motor symptoms appear.

175.   There is currently no cure for PD. No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

2.   **Pathophysiology**

176.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.

177.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function, among other things.

178.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

179.    Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.

180.    The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.

181.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

182.    Scientists who study PD generally agree that oxidative stress is a major factor in —if not the precipitating cause of — the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

3.    **Paraquat's Toxicity**

183.    Paraquat is highly toxic to both plants and animals.

31

184.    Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.

185.    Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.

186.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure:  it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

187.    The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life — photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

188.    The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.

189.    Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

190.    Paraquat's redox properties have been known since at least the 1930s.

191.    Paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling has been known since at least the 1960s.

32

192.    The surfactants with which the concentrates containing Paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase Paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, the lungs, and the gastrointestinal tract.

### 4.    Paraquat and Parkinson's Disease

193.    The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons — Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

194.    Although PD is not known to occur naturally in any species other than humans, PD research is often performed using "animal models," in which scientists artificially produce in laboratory animals conditions that show features of PD. Paraquat is one of only a handful of toxins that scientists use to produce animal models of PD.

195.    In animal models of PD, hundreds of studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD, and motor deficits and behavioral changes consistent with those commonly seen in human PD.

196.    Hundreds of *in vitro* studies have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

33

197.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between Paraquat exposure and PD, including multiple studies finding a two- to five-fold or greater increase in the risk of PD in populations with occupational exposure to Paraquat compared to populations without such exposure.

198.    Defendants had knowledge of these studies and the relationship between Paraquat exposure and Parkinson's disease but actively and fraudulently concealed this information from Plaintiff and others.

**H.    Paraquat Regulation**

199.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

200.    Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

201.    FIFRA generally requires that the registrant conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

202.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person ... any pesticide which is ... misbranded." 7 U.S.C. § 136j(a)(1)(E).

34

203.    A pesticide is misbranded under FIFRA if, among other things:

a.      its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

b.      the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

c.      the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(l)(G).

204.    Because it is unlawful to sell a pesticide that is registered but nevertheless misbranded, manufacturers have a continuing obligation to adhere to FIFRA's labeling requirements. 7 U.S.C. § 136j(a)(1)(E), § 136a(f)(2), § 136a(f)(1).

205.    Manufacturers are likewise obligated to report incidents involving a pesticide's toxic effects that may not be adequately reflected in its label's warnings. 40 C.F.R. 159.184(a), (b).

206.    Mr. and Mrs. Grandcolas do not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA. Accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of Paraquat or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, or concealed, suppressed, or omitted to disclose any material fact about Paraquat or engaged in any unfair or deceptive practice regarding Paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the Paraquat "misbranded" under FIFRA; however, Mr. and Mrs. Grandcolas bring claims and seek

35

relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

**I.        Fraudulent Concealment and Tolling**

207.    Mr. and Mrs. Grandcolas did not discover their injuries earlier because they had no reason to suspect that residing near where Paraquat was used could cause Mr. and Mrs. Grandcolas to suffer Parkinson's disease.

208.    Defendants SCPLLC and SAG took active steps to conceal this harmful side effect of Paraquat.

209.    In response to growing concerns regarding the safety of Paraquat, Syngenta published a website at www.Paraquat.com for the purpose of convincing the public that Paraquat is safe.

210.    Syngenta's statements proclaiming the safety of Paraquat and disregarding its dangers were designed to mislead the agricultural community and the public at large – including Mr. and Mrs. Grandcolas.

211.    Defendants knew or should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment.

212.    However, despite this knowledge, Defendants continued to promote its product as safe.

213.    Defendants did not make this knowledge known to Mr. and Mrs. Grandcolas or the general public. Indeed, Defendants failed to adequately warn and instruct Plaintiff of a possible association between Paraquat use and Parkinson's disease.

214.    Even today, Syngenta disavows any connection between Paraquat and Parkinson's disease.

215.    Defendants' acts and omissions were a legal, proximate, and substantial factor in causing both Mr. and Mrs. Grandcolas to suffer severe and permanent physical injuries, pain, mental anguish, and disability, as well as economic loss, and will continue to do so for the remainder of Plaintiff Nancy C. Grandcolas' life and caused Mr. Grandcolas's death.

216.    All applicable statutes of limitations have been tolled by Defendants SCPLLC and SAG's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

## IV.    FACTUAL ALLEGATIONS COMMON TO SPECIFIC CLAIMS

### A.    Strict Product Liability – Design Defect

217.    At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat intending or expecting that it would be sold and used in Illinois.

218.    Mr. and Mrs. Grandcolas were exposed to Paraquat sold and used in Illinois that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

219.    The Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed was in a defective condition that made it unreasonably dangerous, in that when used in the intended and directed manner or a reasonably foreseeable manner:

a.      it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who

37

were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.   when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

220.   This defective condition existed in the Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold, and to which Mr. and Mrs. Grandcolas were exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

221.   As a result of this defective condition, the Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed either failed to perform in the manner reasonably expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

222.   The Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed was used in the intended and directed manner or a reasonably foreseeable manner.

**B.   Strict Product Liability – Failure to Warn**

223.   At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert were engaged in the business of

38

designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat intending or expecting that it would be sold and used in Illinois.

224.    Mr. and Mrs. Grandcolas were exposed to Paraquat sold and used in Illinois that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

225.    When Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the Paraquat to which Mr. and Mrs. Grandcolas were exposed, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

   a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

   b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause, potentiate, promote, or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

226.    The Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

39

a.     it was not accompanied by directions for use that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.     it did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological damage.

227.     This defective condition existed in the Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed when it left the control of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

228.     As a result of this defective condition, the Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

229.     The Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed was used in the intended and directed manner or a reasonably foreseeable manner.

C.     **Negligence**

230.     At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat intending or expecting that it would be sold and used in Illinois.

231.    Mr. and Mrs. Grandcolas were exposed to Paraquat sold and used in Illinois that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Illinois.

232.    The Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed was used in the intended and directed manner or a reasonably foreseeable manner.

233.    At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, and in acting in concert with others who did so, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Decedent Thomas E. Grandcolas and Plaintiff Nancy C. Grandcolas.

234.    When Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Mr. and Mrs. Grandcolas were exposed, it was reasonably foreseeable, and Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known, that when Paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

      a.     it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

41

b.   when inhaled, ingested, or absorbed into the bodies of persons who used it, who
were nearby while it was being used, or who entered fields or orchards where it
had been sprayed or areas near where it had been sprayed, it was likely to cause,
potentiate, promote, or contribute to cause latent neurological damage that was
both permanent and cumulative, and repeated exposures were likely to cause or
contribute to cause clinically significant neurodegenerative disease, including PD,
to develop long after exposure.

235.   In breach of the aforementioned duty to Mr. and Mrs. Grandcolas, Defendants

SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert

negligently:

a.   failed to design, manufacture, formulate, and package Paraquat to make it
unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used
it, who were nearby while it was being used, or who entered fields or orchards
where it had been sprayed or areas near where it had been sprayed;

b.   designed, manufactured, and formulated Paraquat such that when inhaled,
ingested, or absorbed into the bodies of persons who used it, who were nearby
while it was being used, or who entered fields or orchards where it had been
sprayed or areas near where it had been sprayed, it was likely to cause or
contribute to cause latent neurological damage that was both permanent and
cumulative, and repeated exposures were likely to cause or contribute to cause
clinically significant neurodegenerative disease, including PD, to develop long
after exposure;

c.   failed to perform adequate testing to determine the extent to which exposure to
Paraquat was likely to occur through inhalation, ingestion, and absorption into the
bodies of persons who used it, who were nearby while it was being used, or who
entered fields or orchards where it had been sprayed or areas near where it had
been sprayed;

d.   failed to perform adequate testing to determine the extent to which Paraquat spray
drift was likely to occur, including its propensity to drift, the distance it was likely
to drift, and the extent to which Paraquat spray droplets were likely to enter the
bodies of persons spraying it or other persons nearby during or after spraying;

e.   failed to perform adequate testing to determine the extent to which Paraquat,
when inhaled, ingested, or absorbed into the bodies of persons who used it, who
were nearby while it was being used, or who entered fields or orchards where it ad
been sprayed or areas near where it had been sprayed, was likely to cause or
contribute to cause latent neurological damage that was both permanent and
cumulative, and the extent to which repeated exposures were likely to cause or

42

contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

f.      failed to perform adequate testing to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

g.      failed to direct that Paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

h.      it did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect those exposed from the risk of neurological damage.

**D.      Consumer Fraud and Deceptive Business Practices Act**

236.      At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold Paraquat intending or expecting that it would be sold and used in by Decedent Thomas E. Grandcolas.

237.      Mr. and Mrs. Grandcolas were exposed to Paraquat that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used and St. Clair Services Company purchased for the purpose of controlling weeds and not for resale.

43

238.    At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert had actual or constructive knowledge that when used in the intended and directed manner or a reasonably foreseeable manner:

a.    Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

239.    At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert had actual or constructive knowledge that:

a.    adequate testing had not been performed to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.    adequate testing had not been performed to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

c.    adequate testing had not been performed to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

44

    d.      adequate testing had not been performed to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

240.    From the first date on which Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert placed Paraquat that they designed, manufactured, distributed and sold into the stream of commerce through the last date on which Mr. and Mrs. Grandcolas were exposed to Paraquat that they designed, manufactured, distributed, and sold, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert engaged in unfair or deceptive acts or practices, including but not limited to deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of material facts, regarding their design, manufacture, distribution, and sale of Paraquat, in that they:

    a.      concealed, suppressed, or omitted to disclose that Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

    b.      concealed, suppressed, or omitted to disclose that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

    c.      concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who

used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

d.   concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which Paraquat spray drift was likely to occur,  including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.   concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.   concealed, suppressed, or omitted to disclose that adequate testing had not been performed to determine the extent to which Paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

241.   These acts and practices of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling Paraquat for use were "unfair" because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

242.   These acts and practices of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling Paraquat were immoral and unethical, as they served only to benefit Defendants SCPLLC

46

and SAG, their corporate predecessors, and others with whom they acted in concert at the expense of the health of purchasers and users of Paraquat and the public.

243.    These acts and practices of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling Paraquat were likely to cause substantial injury to purchasers and users of Paraquat and the public by exposing them to unnecessary risks to their health.

244.    These acts and practices of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling Paraquat were likely to cause, and did cause, substantial injury to purchasers and users of Paraquat and the public in that but for these acts and practices Paraquat would not have been purchased and persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed would not have been injured by it.

245.    The injuries caused by these acts and practices of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling Paraquat, namely purchasers' monetary losses and the injuries and damages (including monetary losses) to persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, including Mr. and Mrs. Grandcolas, are not outweighed by any countervailing benefit to consumers or competition.

246.    The injuries caused by these acts and practices of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert in manufacturing, distributing and selling Paraquat, namely purchasers' monetary losses and the injuries and

47

damages (including monetary losses) to persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, or whose water supply had been contaminated with Paraquat, including Mr. and Mrs. Grandcolas, were not reasonably avoidable; because Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert in manufacturing, distributing, and selling Paraquat were the sole sources of material information and they failed to disclose this information, and consumers therefore could not have had reason to anticipate the impending harm and thus avoid their injuries.

247.    Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert intended that purchasers of the Paraquat that they manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed, purchased it in reliance on these unfair and deceptive acts and practices.

248.    The facts that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert concealed, suppressed, or omitted to disclose were material to the decisions to purchase the Paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert manufactured, distributed, and sold and to which Mr. and Mrs. Grandcolas were exposed, in that it would not have been purchased had these facts been disclosed.

249.    These unfair and deceptive acts and practices of Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert occurred in connection with their conduct of trade and commerce in the state of Illinois.

     E       **Breach of Implied Warranty of Merchantability**

48

250.    At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling Paraquat and other restricted-use pesticides and held themselves out as having knowledge or skill regarding Paraquat and other restricted-use pesticides.

251.    At all times relevant to this claim, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold Paraquat intending or expecting that it would be sold and used in the United States.

252.    Mr. and Mrs. Grandcolas were exposed to Paraquat sold and used that Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used.

253.    At the time of each sale of Paraquat to which Mr. and Mrs. Grandcolas were exposed, Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

254.    Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of Paraquat to which Mr. and Mrs. Grandcolas were exposed, in that it was not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

49

b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

## COUNT I

## STRICT PRODUCT LIABILITY – DESIGN DEFECT
## AGAINST DEFENDANTS SCPLLC AND SAG

255.    Mr. and Mrs. Grandcolas incorporate all allegations in the preceding paragraphs as if fully set forth herein and further allege:

256.    As a direct and proximate result of the defective and unreasonably dangerous condition of the Paraquat manufactured, distributed, and sold by Defendants SCPLLC and SAG, their corporate predecessors, and others with whom they acted in concert, Decedent Thomas E. Grandcolas developed neurological injuries; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff Nancy C. Grandcolas life; has suffered the loss of a normal life and will continue to do so for the remainder of Plaintiff Nancy C. Grandcolas' life; has lost income that Mr. and Mrs. Grandcolas otherwise would have earned and will continue to do so for the remainder of Plaintiff Nancy C. Grandcolas life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff Nancy C. Grandcolas' life.

257.    Defendants' reckless disregard for the safety of users of Paraquat, including Plaintiff Nancy C. Grandcolas, justifies an award of punitive damages.

WHEREFORE, Plaintiffs respectfully pray for a judgment in Plaintiffs' favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an

50

amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT II

### STRICT PRODUCT LIABILITY – FAILURE TO WARN
### AGAINST DEFENDANTS SCPLLC AND SAG

258.    Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth herein and further allege:

259.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the Paraquat manufactured, distributed and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Decedent Thomas E. Grandcolas developed neurological injuries and Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and died as a result of his Parkinson's disease that he developed as a result of his above-described frequent, regular and significant exposures to Paraquat.

260.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the Paraquat manufactured, distributed and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff Nancy Grandcolas developed neurological injuries and Parkinson's disease, which is a progressive and debilitating disease ; has suffered severe and permanent physical pain, mental anguish, and disability; has suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and will continue to suffer from these injuries and damages for the rest of her life.

261.    Defendants knew of the danger posed to humans by their product Paraquat.

262.    Defendants had a duty to warn Decedent, Plaintiff Nancy C. Grandcolas, and the public at large of the dangers related to their Paraquat product.

263.    Defendants' failure adequately to warn Decedent, Plaintiff Nancy C. Grandcolas, and the public at large evidences negligence in relation to Defendants' duty to warn.

264.    Defendants' reckless disregard for the safety of users of Paraquat, including Plaintiff Nancy C. Grandcolas, justifies an award of punitive damages.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment in Plaintiff's favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT III

### NEGLIGENCE
### AGAINST DEFENDANTS SCPLLC AND SAG

265.    Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth herein and further allege:

266.    As a direct and proximate result of the negligence of SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Decedent Thomas E. Grandcolas developed neurological injuries and Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and died as a result of his Parkinson's disease that he developed as a result of his above-described frequent, regular and significant exposures to Paraquat.

267.    As a direct and proximate result of the negligence of Defendants, Plaintiff Nancy Grandcolas developed neurological injuries and Parkinson's disease, which is a progressive and

debilitating disease; has suffered severe and permanent physical pain, mental anguish, and disability; has suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and will continue to suffer from these injuries and damages for the rest of her life.

268.    Defendants' reckless disregard for the safety of users of Paraquat, including Mrs. Grandcolas, justifies an award of punitive damages.

WHEREFORE, Plaintiffs respectfully pray for a judgment in Plaintiffs' favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT IV

### NEGLIGENCE
### AGAINST DEFENDANT ST. CLAIR SERVICES COMPANY

269.    Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth herein and further allege:

270.    Defendant Services Company owed a duty to Mr. and Mrs. Grandcolas, and other members of the public to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat or other harmful chemicals sprayed, applied, or otherwise utilized by Defendant Services Company.

271.    Defendant Services Company breached the aforementioned duty when they or their agents:

a.    failed to perform adequate testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

b.      failed to perform adequate testing to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

c.      failed to direct that Paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

d.      failed to spray, apply, or otherwise use Paraquat in the manner in which it was required or intended to be used by the manufacturer causing Paraquat to contaminate water, soil, and property other than the property it was sprayed or applied to.

272.    As a direct and proximate result of the negligence of Defendant Services Company and others with whom they acted in concert, Decedent Thomas E. Grandcolas developed neurological injuries and Parkinson's disease, which is a progressive and debilitating disease; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and died as a result of his Parkinson's disease that he developed as a result of his above-described frequent, regular and significant exposures to Paraquat.

273.    As a direct and proximate result of the negligence of Defendant Services Company and others with whom they acted in concert, Plaintiff Nancy Grandcolas developed neurological injuries and Parkinson's disease, which is a progressive and debilitating disease; has suffered severe and permanent physical pain, mental anguish, and disability; has suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and will continue to suffer from these injuries and damages for the rest of her life.  Defendants' reckless disregard in the spraying, application, and use of Paraquat for the rights of others,

54

particularly adjacent landowners such as Mrs. Grandcolas, justifies an award of punitive damages.

WHEREFORE, Plaintiffs pray for a judgment in Plaintiffs' favor and against Defendant St. Clair Services Company, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT V

### CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT AGAINST DEFENDANTS SCPLLC AND SAG

274.   Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

275.   As a direct and proximate result of the violations of the Consumer Fraud and Deceptive Business Practices Act by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Decedent Thomas E. Grandcolas developed neurological injuries and Parkinson's disease, which is a progressive and debilitating disease; suffered severe and permanent physical pain, mental anguish, and disability; suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and died as a result of his Parkinson's disease that he developed as a result of his above-described frequent, regular and significant exposures to Paraquat.

276.   As a direct and proximate result of the violations of the Consumer Fraud and Deceptive Business Practices Act by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff Nancy C. Grandcolas developed neurological injuries and Parkinson's disease, which is a progressive and debilitating disease; has suffered severe and permanent physical pain, mental anguish, and disability; has suffered the loss of a normal life; lost income; incurred reasonable expenses for necessary medical treatment; and will continue to

suffer from these injuries and damages for the rest of her life. Defendants' reckless disregard for the safety of users of Paraquat, including Mr. and Mrs. Grandcolas, justifies an award of punitive damages.

WHEREFORE Plaintiffs pray for a judgment in Plaintiffs' favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT VI**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AGAINST DEFENDANTS SCPLLC AND SAG**

277.   Plaintiffs incorporate all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

278.   As a direct and proximate result of the breaches of the implied warranty of merchantability by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiffs Defendants' reckless disregard for the safety of users of Paraquat, including Decedent Thomas E. Grandcolas, justifies an award of punitive damages.

WHEREFORE Plaintiffs pray for a judgment in Plaintiffs' favor and against Defendants Syngenta Crop Protection LLC and Syngenta AG, jointly and severally, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

**COUNT VII**

**LOSS OF CONSORTIUM AGAINST DEFENDANTS SCPLLC AND SAG**

279.   Plaintiff Nancy C. Grandcolas incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

56

280.    Mr. and Mrs. Grandcolas married on May 27, 1967 and continued to be married until Decedent's death on January 5, 2021.

281.    As a result of the wrongful and negligent acts of the Defendants in proximately causing Decedent Thomas E. Grandcolas's injuries, including but not limited to Parkinson's disease, Plaintiff has been deprived of the services, society, companionship, and consortium of her husband and has been required to care for him and to expend funds for his medical care and treatment.

282.    As a direct and proximate result of the wrongful and negligent acts of the Defendants in proximately causing Decedent Thomas E. Grandcolas's injuries, including but not limited to Parkinson's disease, Plaintiff Nancy C. Grandcolas has suffered and will continue to suffer in the future, loss of consortium, loss of support and services, loss of love, companionship, affection, society, and other damages allowed under the laws of Illinois.

283.    As a direct and proximate result of wrongful and negligent acts of the Defendants in proximately causing Decedent Thomas E. Grandcolas's injuries, Plaintiff Nancy C. Grandcolas seeks damages for recovery of her loss of consortium, loss of support and services, loss of love, companionship, affection, society, and other damages allowed under the laws of Illinois.

WHEREFORE, Plaintiff Nancy C. Grandcolas respectfully prays that this Court enter judgment in Plaintiff Nancy C. Grandcolas' favor and against Defendants, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## COUNT VIII

### PLAINTIFF DEBORAH K. GORMAN'S
### SURVIVAL ACTION AGAINST ALL DEFENDANTS

284.    Plaintiff Deborah K. Gorman incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

285.    Plaintiff Deborah K. Gorman, as the duly appointed and acting trustee of the Thomas E. Grandcolas Revocable Trust dated September 4, 2000, as amended, has standing to sue Defendants in a survival action pursuant to Illinois Survival Act 755 ILCS 5/27-6.

286.    Plaintiff Gorman, as trustee for the estate of Thomas E. Grandcolas, brings a claim for the conscious pain and suffering of Decedent against Defendants for causing the pain and suffering up to the death of Decedent through the wrongful conduct, acts and/or omissions of Defendants and their agents as set forth herein.

287.    As a direct and proximate result of the wrongful, negligent, grossly negligent, reckless, wanton and willful acts of Defendants and their agents with regard to Paraquat as set forth herein, Decedent developed PD, suffered severe and permanent physical pain, mental anguish, disability, loss of normal life, loss of income that Decedent otherwise would have earned, incurred reasonable expenses for necessary medical treatment, and untimely death.

288.    Plaintiff Gorman, as trustee for the estate of Thomas E. Grandcolas, is entitled to recover all compensatory, punitive and other damages permitted under the law from Defendants for the conscious pain and suffering of Decedent as a direct and proximate result of the wrongful conduct, acts and/or omissions of Defendants and their agents as set forth herein.   Plaintiff therefore respectfully prays that this Court enter judgment in Plaintiff's favor and against Defendants, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

58

## COUNT IX

### PLAINTIFF NANCY C. GRANDCOLAS
### WRONGFUL DEATH AGAINST DEFENDANTS SCPLLC AND SAG

289.   Plaintiff Nancy C. Grandcolas incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

290.   Plaintiff Nancy C. Grandcolas, as surviving spouse of Decedent, has standing to sue Defendants in a wrongful death action.

291.   The death of Decedent was directly and proximately caused as a result of Defendants' wrongful acts, negligence, failure to warn and/or breach of warranties as described herein.

292.   If Decedent was not deceased, Defendants' wrongful acts, negligence, failure to warn, and/or breach of warranties would have entitled Decedent to maintain an action in Decedent's own right to recover damages and other relief.

293.   As a direct and proximate result of Decedent's unfortunate and untimely death, Plaintiff is entitled to damages and other relief as provided by law.

294.   Plaintiff has suffered monetary damages as a result of Decedent's untimely death, including but not limited to funeral and burial expenses, medical expenses, lost wages, loss of earning capacity, and the costs incurred in bringing this action.

295.   Decedent suffered from Parkinson's disease that ultimately led to Decedent's untimely death as a direct and proximate result of the defective and dangerous condition, including but not limited to inadequate warnings of Defendants' Paraquat.

WHEREFORE Plaintiff Nancy C. Grandcolas respectfully prays that this Court enter judgment in Plaintiff's favor and against Defendants, in an amount in excess of $100,000.00 plus costs of suit, and for such further relief as is just and appropriate in the circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in favor of Plaintiffs and seek the following relief against Defendants, jointly and severally:

A.   Compensatory damages in excess of $75,000, exclusive of interest and costs;

B.   Costs of suit;

C.   Pre-judgment and post-judgment interest;

D.   Special damages as proved by the evidence;

E.   Punitive damages; and

F.   Such other relief as this Court deems just and proper under the circumstances.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

By:   *s/ Christopher Cueto*
Christopher Cueto, IL 6192248
**Law Office of Christopher Cueto, Ltd.**
7110 W Main St.
Belleville, IL 62223
Phone: 618-277-1554
Facsimile: 618-277-0962
ccueto@cuetolaw.com

**CAREY DANIS & LOWE**
Joseph P. Danis
Andrew J. Cross
Andrew D. Steiniger
8235 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105
jdanis@careydanis.com
across@careydanis.com
asteiniger@careydanis.com

*Attorneys for Plaintiffs*

60